UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAWN A. WILSON,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )        Case No. 4:05CV00537 AGF
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )
            Defendant.             )


**<u>MEMORANDUM AND ORDER</u>**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Dawn Wilson's application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381-1384(f).[1]  For the reasons set forth below, the decision of the

Commissioner will be reversed and the case remanded for further consideration.

Plaintiff, who was born on November 28, 1967, applied for SSI benefits on July 7,

2003, at age 36, alleging a disability onset date of February 26, 2001, due to mental

illness, a leg injury, and irritable bowel syndrome ("IBS").  After Plaintiff's application

was denied at the initial administrative level, she requested a hearing before an

Administrative Law Judge ("ALJ").  Following a hearing on August 19, 2004, the ALJ

found on November 12, 2004, that Plaintiff's impairments were not "severe," as defined

_____

[1]      The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

by the Act, and that thus, Plaintiff was not disabled.  Plaintiff had filed a prior application for SSI benefits that was denied on October 9, 2002, following a hearing, and not pursued further.  Accordingly, the ALJ in the present case only considered Plaintiff's disability status as of October 10, 2002.  On January 31, 2005, the Appeals Council denied Plaintiff's request for review.  Plaintiff has thus exhausted all administrative remedies and the ALJ's November 12, 2004 decision stands as the final agency action.

Plaintiff argues that the ALJ erred in determining that Plaintiff's disabilities were not severe, and thus ending the evaluation after step two of the five-step process set out in 20 C.F.R. § 416.920 to evaluate disability claims.  Specifically, Plaintiff argues that in assessing Plaintiff's credibility, the ALJ erred by failing to give adequate weight to the medical evidence and instead relied too heavily on Plaintiff's sporadic history of medical treatment.  She also argues that the ALJ improperly ignored the records from Plaintiff's treating psychiatrist, John Crane, M.D., dated after October 2003.  Lastly, Plaintiff argues that the ALJ did not properly consider Plaintiff's good cause for failure to follow prescribed treatment, namely Plaintiff's financial difficulties and mental impairment.

## BACKGROUND

### Work History

According to Plaintiff's work history report submitted with her application for benefits, she worked as a baker from 1992 to 1993; as a teacher's assistant from 1997 to 2000; and as a home healthcare giver from 2000 to 2001.  Plaintiff reported that she

worked five hours a day and five days a week for wages of $6.50 per hour for each position.  Tr. at 82-85.

**Medical Record**

The medical record indicates that Plaintiff was admitted to a hospital psychiatric unit in 1999, after her first husband left her abruptly, and in 2000 after she cut her wrists. Tr. at 153.  The admitting psychiatrist in 1999 was Dr. John Crane.

On August 20, 2001, Plaintiff was seen by Tammy Waltz, Family Nurse Practitioner.  Plaintiff complained of continued headaches that made her feel nauseous, pain in her right ankle due to a previous injury, and depression that had been exacerbated by her husband taking away her children.  Waltz assessed Plaintiff's conditions as depression, headache, and right ankle pain and noted that she would refer Plaintiff to "psychiatry and psychologist" and review an x-ray of Plaintiff's ankle.  Tr. at 224.

Plaintiff was seen by Waltz again on September 26, 2001, at a follow-up visit for Plaintiff's depression.  Plaintiff stated that she was scheduled to see a psychologist and that she was taking 60 mg of Celexa (antidepressant) daily, but that she occasionally missed a dose.  Waltz refilled Plaintiff's Celexa prescription and recommended counseling.  Tr. at 223.

At a visit on May 17, 2002, Plaintiff complained to Waltz of frequent urination and dysuria (painful urination) as well as pelvic pain, and asked for samples of Celexa to treat her continuing mood swings.  Waltz assessed Plaintiff with a urinary tract infection and

depression and prescribed Cipro for seven days. Waltz also gave Plaintiff samples of Celexa and advised Plaintiff to follow-up in ten days to recheck her urine. Tr. at 127-29.

On August 26, 2002, Plaintiff saw gastroenterologist, Barbara Dixon-Scott, M.D., for a colonoscopy. Dr. Dixon-Scott noted that Plaintiff had a history of intermittent lower abdominal pain, and diagnosed Plaintiff with internal hemorrhoids, few sigmoid diverticuili, and a question of extrinsic compression about 60 cm from the anal verge. She prescribed Miralax (for constipation). Tr. at 196-99.

Plaintiff met with Dr. Crane on September 3, 2002, at which time Dr. Crane noted that Plaintiff's main concern was that her ex-husband was not allowing her to visit her children. Plaintiff told Dr. Crane that she had sought mental-health treatment "off and on" since 1999, mainly for depression, and that she was currently taking Celexa, but she complained of sedation associated with this medication. Dr. Crane diagnosed Plaintiff with major depression, recurrent, rule out bipolar disorder. He recommended that Plaintiff return in one week and noted that he would start Plaintiff on Lexapro (a treatment for major depression). Tr. at 216-17. Plaintiff returned on September 10, 2002, and continued to complain about sedation associated with Celexa. Dr. Crane recommended that Plaintiff cross taper Celexa with Wellbutrin over the course of two weeks, and noted that Plaintiff's mood seemed calmer. Tr. at 218.

On December 31, 2002, Plaintiff presented at a hospital emergency room with bloody stool and chronic lower abdominal pain. Steven J. Judge, M.D., was the attending physician. Plaintiff denied "any chronic change in mental status and persistent agitation."

The physical examination did not reveal any motor or sensory deficits, and bowel obstruction imaging revealed no evidence of bowel obstruction. Dr. Judge noted that Plaintiff was stable upon discharge from the ER, but that due to her rectal bleeding, he would refer her to another physician for further outpatient evaluation. Tr. at 180-82.

Plaintiff began meeting with counselor Frances Wollard on February 3, 2003, as a result of court-ordered counseling for Plaintiff and her daughter. Plaintiff was accompanied by a neighbor on this visit. Wollard noted that Plaintiff was a "very, very angry woman" and that Plaintiff told her that she had been prescribed Wellbutrin, but was only taking it about twice a week. Wollard also noted that Plaintiff's staying stabilized on medication would likely be essential to carrying out the plan to allow Plaintiff to visit with her children regularly. Tr. at 151-52.

Plaintiff met with Wollard again on February 10, 2003. Wollard noted that the relationship with Plaintiff had improved since the previous week and that Plaintiff brought a petition to work on with Wollard to allow Plaintiff to visit with her children. Wollard indicated that Plaintiff was "thinking more clearly" than in the first visit, and that Plaintiff demonstrated "quite a little self understanding." Tr. at 150. Plaintiff cancelled scheduled counseling appointments with Wollard on February 18 and February 24, 2003. Tr. at 148-49.

During her counseling session with Wollard on March 3, 2003, Plaintiff worked on a letter to obtain permission from the judge to pick her children up from school. Plaintiff indicated that she would like to continue seeing Wollard even if the judge denied her

request.  Tr. at 147.  After cancelling her March 10, 2003 appointment, Plaintiff continued to meet with Wollard biweekly until May 5, 2003.  At her April 21, 2003 visit, Plaintiff mentioned the possibility of going to work in order to earn money to pay a lawyer to assist in her custody battle.  Plaintiff cancelled her May 5 and May 12 appointments, reportedly due to lack of transportation or gas money.  Plaintiff next met with Wollard on May 19 and May 26, 2003.  Wollard noted that they spent much of the time talking about potential visitation scenarios if their letter to the judge were successful.  After Wollard received notice from the court on June 16, 2003, that no adjustments to the court order were possible, Wollard spoke to Plaintiff one more time before Plaintiff decided to discontinue counseling.  Tr. at 134-48.

On July 28, 2003, Plaintiff's friend, Janice M. Cowsert, completed a third-party Social Security Administration Function Report about Plaintiff.  Cowsert noted that she had known Plaintiff for four years, that the two of them would go shopping and watch television together, and that she and Plaintiff talked on a daily basis.  Cowsert described Plaintiff as someone who cried daily from pain and emotion, had trouble remembering instructions, and needed encouragement to leave the house or at times even her bed.  Cowsert explained that Plaintiff was too depressed to cook more than simple meals, had trouble concentrating, and needed to be reminded or encouraged to groom herself regularly.  Cowsert further noted that any activities that involved Plaintiff's stomach or leg caused her pain and that Plaintiff's ability to use the toilet was affected by her conditions because she was often constipated and her weak bladder caused incontinence.  Cowsert

also stated that she had observed Plaintiff's condition growing worse over the four years they had known each other, and that Cowsert often had to remind Plaintiff where they were going. Tr. at 90-98.

At the request of the Social Security Administration, Dr. Crane met with Plaintiff on October 13, 2003, for a psychiatric evaluation. Dr. Crane described Plaintiff's appearance at the evaluation as poorly groomed, with wringing hands, a slow gait, and somewhat retarded motor behavior. During questioning about her personal history, Dr. Crane noted that Plaintiff became tense and, at one point, tearful. Tr. at 153-55.

Plaintiff told Dr. Crane that she was not taking any medication, and explained that although Dr. Crane prescribed Wellbutrin for her almost a year before, she did not continue to take it because she did not have insurance and could not afford the cost. Plaintiff reported that her only current physical ailment was IBS, which caused her cramping abdominal pain, and for which she had never received treatment. Tr. at 154-55.

Dr. Crane noted that Plaintiff presented symptoms of Major Depressive Disorder, specifically: depressed ideation, psychomotor slowing, tearfulness, poor focus and concentration, low energy and interest, little awareness of her current situation, and at least a history of suicidal ideation. Dr. Crane's evaluation concluded that Plaintiff suffered severe impairment in her ability to understand and remember instructions, even of a simple nature; severe impairment in her ability to maintain social functioning; and severe impairment in her ability to concentrate or demonstrate persistence and appropriate pace. Dr. Crane predicted that Plaintiff would experience "repeated episodes of deterioration" in

a work setting if she were to try to obtain a job. Dr. Crane recommended that Plaintiff visit the Family Wellness Center to obtain more samples of antidepressant medication. Tr. at 156. Plaintiff returned to Dr. Crane's office on November 3, 2003, but left without being seen. Tr. at 218.

A non-examining state agency consulting psychologist, Michael P. Stacy, Ph.D., completed a Psychiatric Review Technique Form about Plaintiff on October 30, 2003. Dr. Stacy determined that based upon Plaintiff's alleged affective disorder (depression), anxiety-related disorder (post-traumatic stress syndrome), and personality disorders not otherwise specified (NOS), Plaintiff's impairments were severe, but not expected to last 12 months. Dr. Stacy projected, in checkbox format, that with routine treatment and compliance, by July 2004, Plaintiff would have mild restrictions to her daily activities; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. He also indicated a history of one or two episodes of decompensation, each of extended duration. Tr. at 157-171.

On October 31, 2003, non-medical consultant Lisa Masek completed a physical residual functional capacity ("RFC") assessment of Plaintiff based on a review of the record. Masek noted that there were no exertional limitations established for Plaintiff in terms of lifting, carrying, standing, walking, sitting, pushing, or pulling. Masek concluded that Plaintiff's IBS and leg injury would not interfere with her ability to work. Masek pointed to Plaintiff's statements to Dr. Crane in her psychological evaluation that Plaintiff's only serious physical illness was IBS, and Plaintiff's lack of medical diagnosis

8

for IBS, to support Masek's conclusion that Plaintiff's alleged disabling physical symptoms were not consistent with medical findings and thus not credible. Masek also reasoned that Plaintiff did not mention or appear to be limited by her "leg injury" and that Plaintiff had "no recent treatment for physical complaints." Masek further reported that Plaintiff's affective, anxiety, and personality disorders currently caused her limitation, but that Plaintiff's mental condition was treatable with medication and that the limitation was not expected to last 12 months. Tr. at 172-79.

Plaintiff went to the BJC Health Center on November 12, 2003, complaining of a sore throat, pain in her lower abdomen, and frequent urination. Plaintiff was assessed with sinusitis, dysuria, and right leg pain. The attending physician prescribed Ceftin (for infections, including streptococcal) and Naprosyn (a non-steroidal anti-inflamatory drug). Tr. at 210-11. Plaintiff returned on November 27, 2003, and met with Jennifer Follwell, D.O. Plaintiff continued to complain of a sore throat and painful urination. Dr. Follwell diagnosed Plaintiff with acute sinusitis, chronic urinary tract infections, worsening depression, and fatigue, and prescribed Levaquin (for infections, including streptococcal and urinary tract infections), Urised (for lower urinary tract discomfort), and Lexapro with a recommended follow-up in three weeks. Tr. at 208-09.

At a December 16, 2003 follow-up visit with Dr. Crane, Plaintiff expressed that samples of Lexapro she had received two weeks before "worked better than anything I've ever been on." Plaintiff explained that she continued to experience problems in obtaining Medicaid coverage. She stated that her caseworker told her she had been granted

coverage, but she had not yet received proof of this. Dr. Crane noted that Plaintiff's mood seemed brighter, and he gave her more samples of Lexapro. Tr. at 219.

The record contains a determination of the Missouri Department of Social Services that Plaintiff was permanently and totally disabled for one year or longer and was medically eligible for Medicaid Assistance benefits. This determination was based upon Dr. Crane's report of October 13, 2003. Tr. at 64-68.

On January 22, 2004, Plaintiff complained to Dr. Follwell of problems with depression and worsening right knee pain. Dr. Follwell refilled Plaintiff's prescriptions for Lexapro, Naprosyn, and Urised and ordered x-rays of both of Plaintiff's knees. Tr. at 206-07. The January 30, 2004 x-rays revealed that Plaintiff's left knee was normal and that the right knee showed some mild degenerative spurring. Tr. at 215.

Plaintiff called Dr. Dixon-Scott's office on January 30, 2004, complaining of blood in her stool. Plaintiff requested an appointment with a doctor other than Dr. Dixon-Scott whom she did not wish to see again. Plaintiff was informed that the first available appointment was with Carl Blatt, M.D., on March 16, 2004. When the receptionist suggested that Plaintiff call her primary care physician, Dr. Modad, to get an appointment before March, Plaintiff explained that she was no longer seeing Dr. Modad. Plaintiff further explained that she had been seeing Dr. Glen Calvin, D.O., but that she had a bad experience with him and did not want to go back to him either. Tr. at 194-95.

On February 12, 2004, Plaintiff visited Sunil M. Apte, M.D., in regards to frequent and urgent urination. Dr. Apte noted that Plaintiff did not want a physical exam, gave a

primary diagnosis of urinary frequency with a history of kidney stone, and recommended a CT scan of Plaintiff's abdomen and pelvis. The CT scan revealed some "subtle thickening and narrowing" of the sigmoid colon and further evaluation of Plaintiff's colon was recommended in light of Plaintiff's clinical history of blood in the stool. Tr. at 188-93. Plaintiff met with Dr. Apte on February 26, 2004, for a follow-up visit and complained of constipation. Dr. Apte conducted a physical examination and gave a primary diagnosis of urine urgency with other diagnoses of incontinence and IBS. Dr. Apte prescribed medication, recommended natural vegetable fiber for Plaintiff's constipation, and told Plaintiff to return in one month if the medication did not work. In response to a phone call on April 1, 2004, Plaintiff cancelled an appointment with Dr. Apte that Plaintiff claimed not to remember. Plaintiff chose not to reschedule due to "too much stress in [her] life." Tr. at 183-88.

On March 11, 2004, Plaintiff met with Dr. Follwell complaining of headaches, difficulty sleeping, and left knee pain. Dr. Follwell assessed Plaintiff with depression and left knee pain, and ordered an MRI for the knee. Dr. Follwell also increased Plaintiff's Lexapro prescription and recommended that she continue counseling. Tr. at 204-05.

On March 16, 2004, Plaintiff kept her appointment with Dr. Blatt. Plaintiff reported that she had been taking Hyoscyamine (used to treat gastrointestinal disorders) for the past six weeks and that it was beneficial to her. Dr. Blatt reviewed Plaintiff's medical history, gave her a physical exam, and scheduled a colonoscopy for May 20, 2004. Plaintiff called Dr. Blatt's office on May 18, 2004, to cancel the May 20

colonoscopy. Dr. Blatt's office attempted to call Plaintiff to reschedule the procedure, but Plaintiff's phone number had been disconnected. Tr. at 194-95.

Plaintiff met with Dr. Crane on April 6, 2004, for another follow-up appointment. Plaintiff reported that she was having some problems with her new husband. Dr. Crane noted that Plaintiff's mood was tense and prescribed a low dose of Seroquel (used to treat schizophrenia and bipolar disorder) in addition to continuing Lexapro. Plaintiff also met with Dr. Crane on June 1, 2004, reporting that she was trying to work things out with her husband and that his behavior had improved. Dr. Crane observed Plaintiff's mood had not changed and recommended that she continue her medications. Tr. at 220.

On June 16, 2004, Plaintiff met with Dr. Follwell regarding increased anxiety and depression because her husband had left her. Plaintiff was also concerned about bruising on her arms and legs. The June 16 record is incomplete, but a two week follow-up visit on June 30, 2004, indicates that Plaintiff was attacked by her ex-husband's girlfriend. Dr. Follwell assessed Plaintiff with depression -- improving, and noted that Plaintiff stated that she was doing better. Dr. Follwell refilled a prescription for Alprazolam (to treat anxiety) and referred Plaintiff to Dr. Blatt and to another physician. Tr. at 201-03.

**Evidentiary Hearing of August 19, 2004**

Plaintiff, who was represented by counsel, testified that she was 36 years old and had completed high school and earned "a couple of credits" in college. She stated that she currently did not have any source of income, but did have medical coverage through Medicaid. Plaintiff described her marital status as separated, and testified that she lived

12

alone. She stated she had children ages 18, 16, 13, and 10, who lived with their father, her first husband, with the exception of her 18 year-old son, who lived "up the road" from her and checked in on her daily. She testified that she was permitted to visit her younger children every other weekend and did in fact see them when she had gas money, which was seldom. She stated she last saw her younger children two or three weeks ago. Tr. at 232-33.

Plaintiff reviewed her employment history, and stated that the last position she held was as a home health aide. She testified that she last worked in this position in March 2001, and that this employment ended due to "too much stress," explaining that the stress was a result of working in people's homes where their problems "mixed up" with hers and upset her. Prior to working as a home health aide, Plaintiff was a teacher's aide. She stated that she was fired from this position for lying about her criminal history. She testified that she did not lie, but that she was unable to fight the accusation because she had a "nervous breakdown." She explained that the main reason she could not work was because she was upset all of the time and could not think straight, a condition that has affected her "on and off" since 1999. Tr. at 233-35.

Plaintiff testified that she was seeing Dr. Crane, whom she first saw when she was admitted to the hospital in 1999, and that she did not see him for two years after that, but rather had tried to deal with her condition on her own. Plaintiff testified that Dr. Follwell also treated her for depression, and that some of her medication was prescribed by Dr. Crane and some by Dr. Follwell. Plaintiff stated that she took her medication as

prescribed.  She testified that she had some side effects from her medication, including

drowsiness or inability to sleep, and confusion.  Tr. at 235-39.[2]

Plaintiff described one of the symptoms of her depression or anxiety as crying,

sometimes periodically all day, because her "mind races about stuff."  She stated that she

suffered from an inability to think straight, forgetting dates or days on a weekly basis; and

confusion, which caused her to stay home much of the time.  Plaintiff testified that she did

not drive anymore, because she did not feel it was safe since she recently accidently drove

in the wrong lane toward oncoming traffic.  Plaintiff said that her son drove her places,

including to the hearing.  She estimated that she slept four or five hours per night and that

she spent about two hours per night trying to go to sleep.  She also stated that she

sometimes felt the need to sleep during the day and that she was "droggy."  Tr. at 239-41.

Plaintiff testified that she vacuumed the floor every other day, cooked in the

microwave, and did dishes, but did not do yard work.  She explained that she did not shop

very often because she did not like to be around a lot of people.  She stated that she

received food stamps.  Plaintiff testified that she did not belong to any social organizations

or church because she did not trust strangers or some people from her past.   She stated

that she visited her friend or her friend visited her once or twice a week.  She sometimes

sat in the shade and read the Bible at her house.  She also stated that she did not like to do

---

[2]    The record indicates that Plaintiff's medications at the time of the hearing
included, among others, Lexapro, Xanax, and Seroquel.  Tr. at 112.

personal grooming tasks, such as showering and getting dressed, because she did not feel good.  Tr. at 241-43.

When the ALJ questioned her about her prescription for Xanax due to panic attacks, Plaintiff explained that when she had panic attacks she became very upset, her hands clenched, her heart raced, and she felt hot.  Plaintiff estimated that she experienced panic attacks more than once a month, but explained that she did not "always know time things." Plaintiff testified that she had several doctors' appointments in the near future, including one with a surgeon regarding a tumor on her ovary and another with a new physician regarding her IBS.  Plaintiff confirmed that the state had arranged transportation to these appointments for her through her Medicaid coverage.  Plaintiff testified that, despite her medication, her IBS bothered her when she became upset or ate spicy foods, in which case she experienced severe stomach cramps.  She stated that she was not happy and did not know how to become happy.  Tr. at 243-45.

The ALJ elected not to hear testimony from Plaintiff's son with regard to when Plaintiff met with doctors and treatment dates she could not recall, stating that the doctors' records would be a better source for such information.  Tr. at 245.

**Post-hearing Evidence**

After the evidentiary hearing, Plaintiff submitted a letter dated August 19, 2004, to supplement her testimony.  In the letter Plaintiff stated she has had "emotional problems" all of her life, but that she was afraid to seek help for fear of being "labeled as a nut."  She also stated that she began taking medication for her emotional problems in 1999 under the

care of a Nurse Practitioner.  Plaintiff stated that she was unsure if there was a gap in her

treatment, but that she has been taking medication on a regular basis since "around 2002."

She added that she preferred to seek treatment from medical doctors to "avoid being

labeled."  Plaintiff also stated in her letter that she tried managing on her own in 1999, and

gave the name of counselors she saw in 2000 and 2002 to 2003.  Tr. at 114-16.

**ALJ's Decision**

The ALJ first determined that Plaintiff had not engaged in substantial gainful

employment since her alleged onset date of February 26, 2001, but noted that because of

Plaintiff's prior application, he was limited to consideration of Plaintiff's disability status

after October 9, 2002.  The ALJ explained that any discussion of earlier medical evidence

was included for background purposes only.  Tr. at 12.  The ALJ then summarized the

medical record, including Dr. Crane's October 13, 2003 report.  The ALJ found that

Plaintiff had the following medically determinable impairments:  "intermittent, mild

mental problems;" mild degenerative spurring of the right knee; and intermittent digestive

complaints.  Tr. at 14-17.  The ALJ determined, however, that these impairment,

individually or in combination, were not "severe" under the Commissioner's regulations.

In reaching this conclusion, the ALJ considered Plaintiff's allegations testimony of

disabling symptoms, and stated that there were discrepancies between Plaintiff's

descriptions of the pain and limitations she experienced as compared to the degree of

medical treatment she sought, and the diagnostic tests, findings, and follow-up treatment

ordered by Plaintiff's physicians.  The ALJ noted that the record showed that Plaintiff had

not followed the treatment prescribed by her physicians, and that she had not provided a good explanation why she had not done so. The ALJ stated that it was not unreasonable to infer that a person with Plaintiff's alleged impairments would consistently and persistently seek medical care, which the ALJ said Plaintiff had not done. The ALJ also specifically noted that Plaintiff had not been persistent in seeking medical treatment for her alleged right leg impairment. Tr. at 16.

The ALJ explained that the credibility of subjective complaints are to be weighted to the degree that they are supported by medical evidence. The ALJ found that Plaintiff's complaints as to the "intensity, persistence, and limiting effects of her symptoms" were not well supported by the record, and that thus, her complaints were not "wholly credible." Tr. at 16.

The ALJ evaluated Plaintiff's mental condition according to Social Security Rule (SSR) 85-28, which provides that "an impairment is not severe if it has no more than a minimal effect on the individual's ability to do basic work activities." Tr. at 16. The ALJ found that Plaintiff had no restrictions in her ability to complete daily living activities; mild difficulties in maintaining social function; mild difficulties in maintaining concentration, persistence, or pace; and no history of episodes of decompensation. The ALJ concluded that Plaintiff's claimed mental impairments presented her with little to no limitations, and thus were not severe. Tr. at 16.

The ALJ applied the duration requirement of 20 C.F.R. § 404.1509, that an impairment must be expected to result in death or last for 12 months, to Plaintiff's claimed

physical and mental impairments, and stated that there was no evidence in the medical record to suggest that Plaintiff's impairments would continue to a severe degree for 12 months. The ALJ noted that due to the lack of evidence in the recent records regarding treatment for an ongoing severe right leg problem, Plaintiff's leg impairment appeared to have improved since her previous SSI application. Tr. at 16.

The ALJ stated that to the extent that the opinions of state agency evaluators and reviewers disagreed with the ALJ's findings, this could be explained by the fact that they did not have the most recent records in the matter, nor did they have the benefit of the testimony from the hearing. Tr. at 16. Without evaluating Dr. Crane's October 13, 2003 opinion, or the weight it was or was not accorded, the ALJ concluded that Plaintiff's combination of symptoms did not significantly restrict her ability to perform basic work activities, and that thus, her impairments were not severe, as that term is defined in 20 C.F.R. § 416.921. Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. Tr. at 16-17.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review is more than an examination of the record for the existence of substantial evidence

in support of the Commissioner's decision; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to SSI benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, SSI benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment, or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers

and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If the claimant has past relevant work and is able to perform it, she is not disabled. If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Here, the ALJ concluded at step two that Plaintiff's combination of impairments was not severe, and so Plaintiff's application was denied without analysis of the remaining steps. Plaintiff challenges the ALJ's reliance upon his finding that Plaintiff did not follow prescribed treatment. Plaintiff asserts that the record includes indications of good cause for any failure to follow prescribed treatment, including her lack of resources. She points out that the record reflects that once she received Medicaid coverage, she was more consistent in following up with Dr. Crane.

More significantly, Plaintiff argues that the ALJ committed reversible error in providing no rationale for failing to credit Dr. Crane's October 13, 2003 opinion. She asserts that this opinion required the ALJ to proceed beyond step two of the sequential evaluation process. She also asserts that there is insufficient evidence to establish that Plaintiff would have recovered in 12 months had she been compliant with treatment.

## DISCUSSION

The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than minimal effect on her ability to work. Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). While a disability claimant has the burden at step two of showing a severe impairment, "the burden on the claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Here, the Court agrees with Plaintiff that the ALJ committed reversible error in failing to discuss the weight to be accorded Dr. Crane's October 13, 2003 opinion. Dr.

Crane was Plaintiff's treating psychiatrist, and accordingly, his opinion on the nature and severity of an impairment deserves controlling weight, if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

There is no indication that Dr. Crane thought that Plaintiff's mental impairments were of less than 12 months duration, or would be so even with strict compliance with treatment. The Court also notes that in apparent reliance upon Dr. Stacey's prediction of Plaintiff's functional limitations as of July 2004, the ALJ committed two apparent errors. First, the ALJ stated that Plaintiff had no restrictions in activities of daily living, whereas Dr. Stacey indicated that she would have mild restrictions in this functional category. Second, the ALJ stated that there was no history of decompensation, whereas Dr. Stacey noted two such periods, and indeed the record establishes two such periods. The ALJ's characterization of Plaintiff's mental impairments as "mild, intermittent" is not supported by the record.

## CONCLUSION

The ALJ's decision that Plaintiff's mental impairments were not severe is not supported by substantial evidence on the record as a whole. On remand, the ALJ is to specifically consider Dr. Crane's October 13, 2003 opinion and explain the weight the ALJ believes it deserves. Furthermore, the ALJ is to proceed with at least steps three and four of the sequential evaluation process to determine whether Plaintiff is disabled (as of October 10, 2002).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED** and the case is **REMANDED** for further consideration.

An appropriate Judgment shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 27th day of September, 2006